## LILY HANSON FALCONER AND WILLIAM RING-GOLD HODGES *vs.* GEORGE A. KIRBY ET AL.

*Construction of a Will Relating to Deduction from Legatee's Share of Indebtedness to the Testator.*

A testator directed " that all sums of money or indebtedness which may be due to me by my sons-in-law, or any or either of them, and the amount of all promissory notes drawn by any or either of them and endorsed by me (if paid by my executors out of my estate) shall be deducted from the shares of their respectives wives in the distribution and settlement of my estate." F., a son-in-law of the testator, was a salaried partner in his business, entitled to receive three thousand dollars a year and ten per cent of the profits if the latter was in excess of three thousand dollars. The greater part of the testator's estate was invested in the business. Before and after his death a large number of suspended accounts were charged off the books of the concern because uncollectable, thereby showing considerable losses. The executor of the estate contended that the share of F.'s wife was chargeable with ten per cent of these losses. It was apparent from the whole will that the testator intended to treat all his children with exact equality in the distribution of the estate. *Held*, that the share of F.'s wife was not chargeable with any part of the losses in business which diminished the volume of the estate, because that was not an indebtedness of F. to the deceased within the meaning of the will, but that the amounts drawn by F. in excess of three thousand dollars a year were chargeable against the share of his wife.

Appeal from a decree of the Circuit Court of Baltimore City (STOCKBRIDGE, J.), whereby it was adjudged that there must be deducted from the share of Mrs. Falconer in the estate of James Hodges, all sums of money of any kind due to the estate of Hodges from Mr. Falconer, and that the amount of such indebtedness found to be due and which must be deducted from the share of Mrs. Falconer in said estate was $14,589.13.

The cause was argued before McSHERRY, C. J., FOWLER PAGE and PEARCE, JJ.

*Wm. Pinkney Whyte* and *W. Starr Gephart,* for the appellants.

*Edgar H. Gans* and *Vernon Cook* (with whom was *B. H. Haman* on the brief), for George A. and Mary E. Kirby, appellees.

*Thomas R. Clendinen,* for St. George W. and Ida Virginia Teackle, appellees.

MCSHERRY, C. J., delivered the opinion of the Court.

The controlling question presented on this appeal involves, and for solution depends on, an ascertainment of what the late James Hodges meant by the seventh clause of his will. We are required, therefore, to interpret that clause and to give to it the effect which he has indicated upon the face of the whole instrument, as, viewed in the light of all the circumstances that surrounded him, he intended it to have. The clause is in these words: "It is my will, and I hereby direct, that all sums of money or indebtedness which may be due to me by my sons-in-law, or any or either of them, and the amount of all promissory notes drawn by any or either of them, and endorsed by me (if paid by my executors out of my estate) shall be deducted from the shares of their respective wives in the distribution and settlement of my estate."

On the one hand it is insisted that Mr. Alexander Falconer, a son-in-law of the testator, is indebted in a considerable amount to Mr. Hodges' estate; on the other, it is contended that he is not indebted in the sum claimed, or, if indebted at all, that the indebtedness is not, with the exception of a small portion, of the kind or character contemplated by the will, and is not, as a consequence, such an indebtedness as Mr. Hodges intended should be charged against the share of his daughter, Mrs. Falconer. The inquiry presents, therefore, alternative aspects. If there is no indebtedness, there is, of course, nothing to be charged against Mrs. Falconer's share. If there is an indebtedness,

it comes to the question whether there is such an indebtedness as Mr. Hodges intended to charge against that share. The first is a mixed question of fact and law, and as an examination of it to determine whether an indebtedness does exist or not, necessarily includes an investigation into the *character* of that indebtedness, and therefore involves a consideration of the other question as to whether the indebtedness, if it does exist, is such an indebtedness as Mr. Hodges intended by his will to charge up against his daughter; it will be more convenient to pass by the first and to proceed at once to the second inquiry.

Assuming an indebtedness of some amount to exist—and this may be done without touching the ultimate question as to whether the indebtedness thus assumed is one that under the will can be charged against Mrs. Falconer's share—*how* did the indebtedness arise? We must put ourselves, as nearly as we can, in the testator's arm-chair; see the circumstances that he saw; appreciate his surroundings as he appreciated them, and then give to the language he has used in his will the meaning which these circumstances and these surroundings indicate he intended that language to have. *Littig* v. *Hance*, 81 Md. 425. Let us look for a moment at the situation. For a number of years Mr. Hodges had been engaged in a large and lucrative mercantile business. Nearly his whole fortune was invested in it, and only an insignificant part was not. He had four children—one son and three daughters. The daughters were married and the son was employed in the father's business. Mr. Falconer, a son-in-law, was also employed in the same business. Because of declining health, absence from home and inability to attend as formerly to so large a commercial enterprise, Mr. Hodges took Mr. Falconer into the business as a partner. Falconer, according to one of the witnesses, was what Mr. Hodges called a "salaried partner." He was to receive three thousand dollars a year and ten per cent of the profits if the latter sum was in excess of three thousand dollars; but in any event he was entitled to three

thousand dollars per annum. He contributed nothing to the capital. From year to year these profits were ascertained by including in the statements of assets a large number of unpaid accounts due by customers to Mr. Hodges, and these unpaid accounts were carried in the statements as suspended accounts. When these suspended accounts, or any of them, were found to be uncollectible they were charged off. Both before and after Mr. Hodges' death and following a period of great financial depression, large proportions of these suspended accounts were so charged off, whereby the books were made to show considerable losses in the business. In addition to this Mr. Falconer overdrew the amounts which, according to his own contention, he was entitled to receive. The aggregate of these overdrafts was three thousand, four hundred and nine dollars and sixteen cents. Ten per cent of the losses on these suspended accounts were charged to Mr. Falconer, and this indebtedness, thus made up and amounting, with the overdrafts, to fourteen thousand five hundred and eighty-nine dollars and thirteen cents, is the indebtedness which Mr. Kirby, one of the executors of Mr. Hodges' will, contends should, under the terms of that will, be charged against the share of Mrs. Falconer. In opposition to this contention it is maintained that neither the language of the will nor the intention of the testator as gathered from that language, when it is read in the light of all the surroundings, includes any of this alleged indebtedness other than the overdrafts. So the contest comes down to these losses in the business. If there is anything clear on the face of the will, and clear beyond controversy, it is that Mr. Hodges intended to treat his children with absolute and exact equality in the distribution of his estate. Some of them he had helped before he made his will and to compensate for this he bequeathed to the one not thus provided for, ten thousand dollars, in order, as he said, " to more nearly equalize her share of my estate." After making a life-provision for his sister and for a niece, he gave the whole residue and re-

mainder of his estate to his four children " in equal por-
tions, share and share alike." To further preserve that
equality the seventh clause, transcribed above, was inserted.
Under it what the sons-in-law owed him—what they had
received from him—and what he might be required to pay
for them on notes given by them and endorsed by him, was
to be deducted from the shares of the respective wives of
those sons-in-law. This method preserved the predominant
scheme of equality ; and the sums which Mr. Falconer drew
in excess of his salary, and which he and his family re-
ceived the benefit of, are therefore chargeable against his
wife's share of the *residuum*. But in what possible way
can the losses in the business—the shrinkage of assets—
which diminished the volume of the estate, be said to be
an indebtedness of Falconer within the meaning of that term
as used in the will ? If these losses constitute an indebt-
edness to the amount claimed, they would equally consti-
tute an indebtedness without reference to the amount of
them, because the amount is purely accidental and has
nothing to do with determining the *character* of the indebt-
edness. If, then, without reference to the *amount*, the
alleged indebtedness created in the manner indicated, was
the *kind* of indebtedness which, as it is insisted, Mr.
Hodges designed to charge against the share of his daugh-
ter, it was altogether possible that Mrs. Falconer might,
instead of receiving one-fourth of the *residuum*, actually
receive nothing ; because had Mr. Falconer's ten per cent
of the losses *of the business* equalled one-fourth of the
estate left for distribution, Mrs. Falconer would not have
been entitled to a dollar. She would not have been enti-
tled to a dollar, not because her husband had received from
Mr. Hodges the equivalent of the share which otherwise
would have been distributed to her, but because the value
of the estate, without fault of his and without benefit to
him or to her, had, by the vicissitudes of business and the
hazards of trade, shrunk below what it was believed to be
worth when Mr. Hodges, to benefit himself and not to im-

poverish Mr. Falconer, took the latter into the business. It is inconceivable that a father, who so unmistakably manifested his purpose to deal with exact equality amongst his children, and who, to free himself in a measure from the cares of business, had made one of his sons-in-law a salaried partner, deliberately intended, under the guise of that transaction, to place that son-in-law in a position where, if disaster befell the business, he would not only be crushed financially, but where his wife might be stripped of the last dollar of her share in that father's estate. To that length the argument must go if sound at all ; and short of that limit it cannot logically stop. If it cannot logically stop short of that limit, Mr. Hodges must be treated as having contemplated the possibility of such a result, because such a result was obviously possible ; and if he must be treated as having contemplated the possibility of such a result, he must be held to have intended to create a condition which might involve co-existent, contemporaneous inconsistencies, namely, that Mrs. Falconer was to have a one-fourth interest in his estate and that she was to have absolutely no part of it, at one and the same time. Manifestly, if this be an indebtedness which the testator meant to include in the seventh clause, it would have been none the less an indebtedness within that same clause had it happened to swell to the full limit of Mrs. Falconer's share. And had that event occurred, we would have been obliged to hold, on the construction contended for by Mr. Kirby, that Mrs. Falconer, who was confessedly in no way responsible for these losses, would be bound to make them up out of her share of the estate to the full limit of that share, though the fact as to whether there would be any estate for division at all, depended, when the will spoke, altogether upon the contingency that the total losses and shrinkages and debts were less than the value of the assets which remained. A construction which would give to three of Mr. Hodges' children the whole of his estate and would throw upon the fourth, as her share, the losses resulting from the business,

in which nearly all the assets of the estate were invested, would be a construction utterly subversive of the equality so conspicuously apparent on the face of the will as the predominant intent of the testator. If this be so, it is no less, in principle, a violation of that equality to cast upon one share losses which affect the value of the whole, even though the sum of those losses be less than the share so charged with them.

Practically the whole estate of Mr. Hodges consisted of his stock in trade and bills receivable. Whether he regarded Mr. Falconer as a partner who was bound to contribute to the losses in the proportion that he was entitled to share in the profits, is immaterial; because the inquiry before us is, not as to whether on an accounting between the partners there is a liability on Mr. Falconer's part to make up a percentage of the losses, but whether, assuming that there is, *that* liability is an indebtedness which the testator's will, as correctly interpreted, directs to be charged against Mrs. Falconer's share of her father's estate.

These losses were losses in the business—they diminished the assets of the concern—they resulted in making the amount for division that much less ; but they neither benefited Mr. Falconer or his wife, nor gave to her an advantage over any of the other children. It is not necessary to include them under the term indebtedness used in the seventh clause in order to give that clause efficacy. There were items of indebtedness due by the sons-in-law to which the clause does apply, and applies without subverting the cardinal idea of equality and without working out the injustice which the contention of Mr. Kirby involves. These items are all of the same kind. They represent sums actually due by the sons-in-law to Mr. Hodges. Some of them were notes representing borrowed money. The overdrafts of Mr. Falconer were of the same nature. Both stood for advances made, substantially, for the benefit of the daughters. Upon these the will can operate, and was obviously intended to operate ; but to extend its effect and

to bring in under it losses in a large and fluctuating business, would be to make the wife of the salaried partner a guarantor against any loss of her husband's in that business up to the full amount of her interest under the residuary clause of her father's will.   We are unwilling to give such a construction to the clause in controversy when there is another and a reasonable one, which gratifies the letter and the spirit of the clause and which is much more in harmony with the testator's scheme of equality and much more in accord with his sense of justice.

, Our conclusion, then, is that the decree, in so far as it charged Mrs. Falconer's share with the overdrafts of her husband amounting to $3,409.16, is correct ; but in so far as it charged her share with the losses amounting to $11,179.97, it is erroneous.   The decree of the lower Court will therefore be affirmed in part and reversed in part, and the cause will be remanded that a new decree may be passed conforming to this opinion ; the costs above and below to be paid out of the estate.

> *Decree affirmed in part and reversed in part and cause remanded, the costs above and below to be paid out of the estate.*

(Decided January 25th, 1900).

PAGE, J., dissented and delivered the following opinion.

With great respect for the opinion of my brothers, I find myself unable to concur in the conclusions they have reached in this case.   I shall give the reasons that seem to me should control, with as much brevity as I can.

The main questions involved may be stated as follows, viz.:—1st.  Was Alexander Falconer indebted to James Hodges at the time of the latter's death, and if so to what extent? and 2nd.  Was it an indebtedness of such a character as to be within the seventh article of Mr. Hodges' will, according to the true intent and meaning of the testator ?

In order to solve these questions properly, a recapitula-

tion of the facts of the case as they appear in the record becomes necessary.

The testator was possessed of a large personal estate, the larger part of which was invested in his business. He was also seized of considerable real estate. He died on the fifteenth day of February 1895. He left surviving him four children,—three daughters, Mary Ellen, wife of George A. Kirby ; Ida Virginia, wife of St. George W. Teakle; and Lily Hanson, wife of Alexander Falconer ; and one son, William Ringgold Hodges. The executors of his estate, George A. Kirby and Alexander Falconer, and all the, children of the deceased were made defendants. By the seventh clause of his will, which will be more particularly referred to later on, Mr. Hodges directed that "all sums of money or indebtedness", which might be due to him from his sons-in-law, should be deducted from the shares of their respective wives in the distribution and settlement of his estate. At the time of his death and for several years prior thereto he had been engaged in business with his son-in-law, Falconer, under the name of Hodges Brothers ; and by the ninth clause of his will he directs that his sole surviving partner, Falconer, shall close up the business "with all possible dispatch without too great a sacrifice of all the goods in stock." The entire capital of the business, amounting to nearly three hundred thousand dollars, was the property of Mr. Hodges. There were no written articles of copartnership ; only a verbal understanding between the co-partners ; but it is conceded that of the profits the testator was to receive ninety per cent and Falconer ten. The questions as to the alleged indebtedness of Mr. Falconer, grow out of the settlement of this business, whether or not he is to be charged with any of the losses of the firm. The parties interested have agreed in writing that if the share of Mrs. Falconer in the settlement of the estate "is to be charged with not only the overdrafts of her husband, but also with *any* proportion of the losses of said firm, that then and in that event, the sum of $14,589,13 shall be taken and

agreed to be the limit and extent of the total liability of her share of the estate for all indebtedness of her husband ; if on the other hand, it be determined by the Court that her share of the estate is to be charged with only the overdrafts made by her husband as a member of the late firm, and not with any portion of the losses thereof, then and in that event, the sum of $3,409,16 shall be taken and considered as the limit and extent of the total liability of her share of the estate for the indebtedness of her husband to her father, and shall be the sum deducted therefrom in the distribution and settlement of the estate."

This agreement seems to concede that all sums due on account of " overdrafts " constitutes an " indebtedness " within the meaning of the seventh clause of the will, and therefore it is incumbent upon us to inquire now whether in addition to the overdrafts, Mrs. Falconer's share is to be further charged with any proportion of the losses of the firm.

Aside from the testimony of Mr. Falconer, to which fuller reference will hereafter be made, the proof as to the verbal agreement between the copartners is meagre and unsatisfactory. The witness, William R. Hodges, on being asked as to the " status " of Falconer in the firm, said that he had heard his father, in " three conversations " with him say that he looked upon Mr. Falconer as a " salaried partner," that he had no capital in the business and that " he (the deceased) had made him a partner to act with power of attorney," in case of his illness or absence from home, but the witness knew nothing whatever of the agreement of copartnership or as to whether it was in writing or not. He could not say " positively," *but* thought he had heard Mr. Hodges say that Falconer was to receive " *about* ten per cent of the *profits*," and, in his next reply, that Mr. Hodges told him that Mr. Falconer was to receive $3,000 " salary." As to what disposition was to made of the " losses," the witness testified that he never heard Mr. Hodges " mention a word." What Mr. Hodges meant

when he used the words " salaried partner "[p] is not clear. The words need some explanation before it is possible to understand what idea was intended to be conveyed by their use. It is as easy to understand that he meant that Falconer was to receive a share of the profits, " as profits," as that he was to receive a salary of $3,000. Indeed he told the witness at one time that Falconer's share of the " profits " was ten per cent, and at another th at he was to receive a " salary " of $3,000. If these rather inconsistent statements are to be accepted, it is clear, that in order to reconcile them, it would be necessary to understand that his meaning was that Falconer was to receive ten per cent of the profits, not to exceed $3,000 ; and if that explanation be correct, it was possible when the profits were not large for him to receive less than that sum ; and if the profits were nothing, that he would receive nothing. The evidence of this witness, when considered in its entirety, seems to prove or tend to prove, no more than that Falconer was a partner entitled to receive ten per centum of the profits, to the extent of $3,000, and that the last mentioned sum was liable to be diminished by diminishing profits ; but there is nothing whatever that tends directly to show, except remotely, what disposition was to be made of losses in a year where they exceeded the profits. As far as it goes it rather tends to show, if there is any tendency at all, that the partners were to share the losses in proportion as they were entitled to profits.

The testimony of the witnesses Start and Pender support that of Hodges, to the extent only of showing that there was a limit to the authority of Falconer, in respect to the amount he might draw. Each of those witnesses states that the decedent in the years 1893 and 1894 frequently " deprecated the fact that Falconer had overdrawn his account without authority." The balance-sheets for those years show that in 1893, he had overdrawn his account to the extent of $3,902, and in 1894, his debits mounted up to $7,718.81; and this, too, after he had been credited by

ten per cent of the profits and charged with the same percentage of losses. They testify that Mr. Hodges told his clerks not to allow Falconer to draw "more than $3,000;" that was the limit. A year or two prior to his death, he directed Start, the book-keeper and cashier, to keep the account down to $3,000 a year, and frequently "during the year" would ask if he was keeping the "account within bounds." He must on those occasions have had reference to the business of 1892 or of 1893, and if we turn to the accounts of those years, we find that though the profits of those years amounted for Mr. Falconer's share of ten per centum, to $3,478.37 for 1892, and $2,521,54 for 1893, or a total for the two years of $5,999.91, yet Mr. Falconer in Dec. 1893 had overdrawn to the extent of $7,718,81. In the light of these facts we may easily understand the "deprecations" of Mr. Hodges and his frequent caution to his clerks to keep Falconer's account "within bounds." It also becomes clear that such cautions can have no tendency to prove what the agreement was between the copartners as to the disposition of the losses in a year when from untoward or unforeseen causes there were no net profits, but only net losses.

In the dearth of direct evidence as to this matter, we are compelled to turn to the examination of the accounts and statements to ascertain from them, if we may, how the copartners themselves regarded the matter. They are material and competent evidence for that purpose, because the intentions of the parties may be gathered from their acts, in connection with the facts and circumstances of the case ; (*Bull* v. *Schuberth*, 2 Md. 55); and where there is no express contract of partnership proved, "the entries in the books" are as conclusive of the rights of the parties, as if they had been found prescribed in a regular contract." *Fleishman* v. *Gottschalk*, 70 Md. 535; *Stewart* v. *Forbes*, 1 McM. & G. 137; *Sangston et al.* v. *Hack and wife*, 52 Md. 192.

Among the exhibits found with the testimony appear six

of the balance-sheets of the firm, made up as of the thirty-first day of December of each year, for the years respectively from 1889 to 1894 inclusive. Each one of these shows a credit or debit, or both, as the case may be, opposite the name of Mr. Falconer. Up to and including the year 1891, the account was in his favor; after that year it was against him. In 1892 there was a debit against him of $2,230.37, in 1893 of $3,902.11, and in 1894 of $7,718.81.

It is in evidence that shortly after Mr. Hodges' death Mr. Kirby, one of the executors, requested Mr. Falconer to furnish a statement showing the condition of the business. In compliance with this request, Falconer handed to him a paper which included the capital account of Mr. Hodges, and a general balance-sheet for the year 1894. The latter showed two debits, as follows:

Alexander Falconer, private account.  .  .  .  $3,000 00
Alexander Falconer .  .  .  .  .  .  .  .  7,718 81

The first item, it is shown in the testimony, represents the amount of Falconer's " drawings " for the year 1894. As to the second item, Falconer was asked for a statement which would show how that amount was made up; and in compliance therewith, he supplied the paper which appears in the record as " Defendants' Exhibit Examiner G. A. K., No. 3." In that the account begins with 31st December, 1888, and shows a credit in his favor as of that date of  .  .  .  .  .  .  .  .  .  .  .  $1,889 93

And proceeds in substance as follows:  Cr.
By 10 per cent profits 31 Dec., 1889 .  .  .  2,417 33
                                                               $4,307 26
Deduct his private acct. (being his drawings during 1889).  .  .  .  .  .  .  .  .  .  3,220 69

To his credit 31 Dec., 1889.  .  .  .  .  .  .  $1,086 57
In 1890, 31 Dec., his share of profits were.  .  4,154 67
                                                     $5,241 24

To be charged with his drawings up to 31 Dec.

1890 . . . . . . . . . . . . .   3,285 04

To his credit 31 Dec., 1890. . . . . . . . $1,956 20
Add thereto his share of profits for 1891 . .   1,375 79
Also 10 per cent of collections of suspended
accounts . . . . . . . . . . . .      92 37
                                              ──────────
                                              $3,424 36
To be charged with his drawings
up to Dec., 1891 . . . . . $4,227 95
Also with 10 per cent losses in
susp. acct. . . . . . . . .   1,426 78  $5,654 73
                              ──────────
At debit 31 Dec., 1891 . . . .            $2,230 37
To be credited with profits up to
31 Dec., 1892 . . . . . . $3,478 37
Also with 10 per cent collections
susp. accts. . . . . . .      5 58
                              ──────────
                              $3,483 95
To be charged with
drawings of 1892 . $4,292 54
Also with 10 per cent
losses susp. acct. .   863 04  $5,155 58  $1,671 63
                               ──────────  ──────────
At debit 31 Dec. 1892 . . . . .           $3,902 00
To be credited with profits up to
31 Dec., 1893 . . . . . . $2,521 54
And charged with his drawings for
1893 . . . . . . . . . .   5,521 00
Also with 10 per cent losses susp.
accts. . . . . . . . .    817 35  $6,338 35
                          ──────────  ──────────
                                      $3,816 81
                                      ──────────
At debit 31 Dec., 1893 . .            $7,718 81

This account shows very clearly how the several items
on the several balance-sheets opposite the name of Mr. Fal-

coner were obtained ; and that was by charging him each year with the amount·he`drew from the business and ten per cent of the losses if there were any, and crediting him with ten per cent of the profits.

This method shows also that Falconer's right to profits depended each year upon what might remain after the losses were accounted for. For instance the balance-sheet of 1891 shows a debit against him of $2,230.37, and this item was reached by crediting him·with the amount in his favor at the close of the year 1890 . . . . . $1,956.20

His share of the profits of 1891

were . . . . . . . . . ·$1,375 79

And of collections of susp. accts . 92 37 $1,468 16

His total credits for 1891 were. . $3,424 36

But he drew that year . . . . $4,227 95

And his share of losses in the ac-

counts not collected was. . . 1,426 78 $5,654 73

Which left him indebted at the end

of the year . . . . . . . $2,230 37

And this amount was charged against him in the balance-sheet of the year ; and was carried forward to the next year, at the end of which a balance-sheet was made up in the same manner.

Mr. Kirby states that Mr. Falconer admitted that these balance-sheets correctly represented his indebtedness to the firm, but Falconer himself denies having made such admissions. However that may be, the absolute correctness of the figures that appear on them is not denied, nor that they were obtained from the books of the firm. Falconer, however, does admit that Kirby asked him to show the "balance-sheet of 1895," and that he showed it to him, and that Kirby "called his attention to the amount of $7,718,81 at my (his) debit." These balance-sheets must have been shown to Mr. Hodges ; they contained the results of the year's business, and as a prudent and experienced man of business he must have scrutinized with care every item

Nor is it denied that he did so. Kirby states that Falconer said to him that he had seen the balance-sheet for 1894, and there is no contradiction of his statement. They appear to have been made out at the end of each year, and it is inconceivable that they would have been allowed to remain in the form they now have unless they had severally been approved by each member of the firm. They show conclusively, in the absence of other proof, that both the co-partners understood that Falconer was to be liable for his proportion of the losses ; and if this be correct it seems to be clear that if the firm failed to make any profits in any year Falconer would not be entitled to receive anything from the business, but would be bound, as between the partners, to bear his proportion of the losses.

Much was said at the argument about the " red-book," but inasmuch as an extended reference to it would be only to repeat much of what has been said, we will not make further allusion to it.

The appellees have objected to the competency of Mr. Falconer to testify in his own behalf with reference to his contract and dealings with Mr. Hodges. Assuming, however, that the objection is not well taken (without, however, so deciding), his evidence as contained in the record is not sufficient to affect the result we have reached. He states that the " arrangement " existing between Mr. Hodges and himself was that " he was to be allowed to draw $3,000 *per annum,* and if at the end of the year, there remained any profit in the business he was to enjoy ten *per cent;"* but he makes no statement at all as to what the understanding was as to the losses. His testimony shows that his association in business with Mr. Hodges, as a partner, began in the year 1888, and that Mr. Lewis was then a member of the firm. The co-partnership agreement between himself, Mr. Lewis and Mr. Hodges, contained the provision that the profits should be ascertained, " after deducting clerk's salaries, wages and all necessary expenses and losses of every kind." At the end of that year Lewis

withdrew from the firm, and Falconer testifies there was no change made in the agreement as to his interest in the profits and "no conversation ever took place between himself and Mr. Hodges in reference to it." It is clear, therefore, that the statement of Mr. Falconer can furnish us with but scant aid as to the manner of the disposition of the losses ; and it seems there is but little left for us to do, even with the aid of his evidence, but to ascertain what we may from the conduct of the parties, as illustrated by the accounts of the firm when taken in connection with all other circumstances of the case. The explanation of Mr. Falconer of the charges against him in the several balance-sheets is far from satisfactory. On being asked why he was so debited he said, the "so-called balance-sheets made up by me from year to year were based upon the system or custom adopted by the members of the firm of Hodges Brothers, which were made up for their *private* use, and simply to show each partner approximately the general result of any year's business ;" and again on cross-examination, "they were made up more as matters of information for the respective partners, that with any idea of their being considered finalities." On being asked what information did the entry *charging* himself with ten per cent of the losses convey, he said, "I did not say that that entry was made to convey information to members of the firm ; I said that the balance-sheets were intended for the purpose of conveying such information, and they simply looked at the difference between the total amount of the assets and the total amount of the liabilities from which they deducted in their minds the amount of expense account, and the loss in the interest account, and thus arrived at the net profit approximately for any one year." If the amount opposite Falconer's name was entered as an asset, when in fact it was not, it is quite enough to point out that nothing could have been more misleading. Mr. Hodges was a merchant of long experience, as may be gathered from the record, and " he had full control of the business," and under such cir-

cumstances it is almost incredible that if the entry was in fact erroneous, he would not have discovered and corrected the error at some time during the five years that the partnership continued.

It was argued with great force and ability by the counsel for the appellant that Mr. Hodges could not have intended that his son-in-law, without capital, should be subjected to the possible losses of his large business, whereby a burden of debt might be laid upon him, from which he might never be able to recover.    But it must be borne in mind what the offer of a partnership meant to Mr. Falconer.    It was a large and well-established business, backed up by a capital of over three hundred thousand dollars.    Doubtless it had been a profitable one.    We have been furnished with no balance-sheet for any year prior to 1889, but in that, its net profits were over twenty-four thousand dollars.    The next year they rose to over forty-one thousand, and for every year up to 1894, the balance-sheets show large gains.    To be tendered a partnership in such a business, without being required to furnish a cent of capital, must have been to Falconer a dazzling offer.    There was indeed a risk of loss, but that is attendant upon every business.    There was, however, a large probability of gain, and to acquire an assured position in such a concern was no small matter.    If the probabilities as to the intent of the parties be estimated by the prospects which both the partners entertained when Falconer became one of the firm, and not as of to-day, when death has removed the principal member and losses have to be met, it is not unreasonable to suppose that the association was created with the expectation of profits and that each member should be liable to share whatever losses there might be.    For several years Falconer's expectations were realized, and he accepted his share of the profits, so that after he had withdrawn such sums as he needed, there still remained considerable amounts to his credit on the books. Then followed a period during which there were losses as well as profits, and the accounts show that when the entry

was made of his own interest, the losses were charged upon the profits, and the net result entered for or against him, as the result might be, with his own acquiescence and approval, and without a word of dissent on the part of Mr. Hodges. Every year showed a net profit up to the last. Whether illness had deprived the business of the skilful care of Mr. Hodges, or the stringency of the times had brought about unexpected and exceptional losses, or some other cause had intervened, in that year there was a balance-sheet which showed all loss and no profit. Can any reason be assigned why the account of Mr. Falconer should not be made up, as it had been in the previous years? Why he should not be charged with ten per cent of the loss, as he had always been, in each year when there had been losses?

I come now to the remaining question : Is the " indebtedness " of Falconer on account of the business of the partnership within the meaning and intent of the seventh clause of the decedent's will? That is as follows : " Article 7th. It is my will, and I hereby direct, that all sums of money or indebtedness, which may be due to me by my sons-in-law, or any or either of them, and the amount of all promissory notes drawn by any or either of them, and endorsed by me (if paid by my executors out of my estate) shall be deducted from the shares of their respective wives in the distribution and settlement of my estate."

It was argued at the hearing by the learned counsel for the appellants that this clause should not be construed so as to include an indebtedness on the part of Mr. Falconer arising out of his liability for any part of the losses of the co-partnership for the reason that it was not within the terms of the co-partnership that he should be responsible for any part of such losses, and therefore Mr. Hodges could never have intended that his daughter's share of his estate should be abated on that account. That argument however falls to the ground if it be determined that it was a part of the agreement of co-partnership, that Falconer should be liable for his proportionate share of the losses. I do not

think therefore that this contention calls for further comment.

The proof shows that Dr. Teackle was indebted to him upon note, that Kirby owed him nothing, and that Falconer was not in his debt except on account of the business. It is true that both Teackle and Falconer had outstanding notes, and that these had been endorsed by Mr. Hodges, but it is clear that the testator did not refer to these when he used the words "all sums of money or indebtedness which may be due to me by my sons-in-law;" for the reason that he provided specifically for the liabilities that his estate might be subjected to because of such endorsements. In respect to these he provides, that " the amount of all promissory notes drawn by any or either of them and endorsed by me (if paid by my executors out of my estate) shall," &c. The whole article shows most conclusively that he had in mind three classes of liabilities on the part of his sons-in-law, viz, " all sums of money " due, all other "indebtedness," and such other as might arise after his death from his endorsement of promissory notes drawn by his sons-in-law or either of them.

The language of the seventh clause of the will is so clear that there seems to me to be no possibility of misunderstanding it. The words are " all sums of money or indebtedness due to me by my sons-in-law or any or either of them." They are plain, unambiguous and without restrictive phrases or connections. They are not affected by anything else that appears in any other part of the instrument or within its four corners. The decision of the Court seems to rest upon the theory that to give to the words of the seventh clause an unrestricted construction would be to defeat in part at least the equality which the testator had in view in the distribution of his estate. But with due respect to my brothers I cannot concede this. The " equality," to which attention must be paid and due consideration given, is that which the testator understood and expressed. Courts cannot raise their own standard of equality

in cases like this and then alter the clear meaning of plain and unambiguous words to make them conform to it. What must be sought, is the intention of the testator, as gathered from the four corners of the will, as he has expressed it. Within the authority of construing does not lurk the power of making a new will. There is no power to refuse to carry out the intention, if it be legal, because we believe it may work an inequality. Now I cannot doubt from a consideration of the whole will that Mr. Hodges intended that all and every indebtedness of each of his sons-in-law should be a charge upon the shares of their respective wives. He imposed this burden upon each of his daughters. It was his idea of equality. If it be conceded that Falconer owes the estate on account of losses of the firm, how did Mr. Hodges intend to deal with such "Indebtedness." There is nothing in the will nor in the transactions of the copartnership that indicates that he intended that it should not be made good ; and if he did not, but on the contrary if he desired that Falconer should remain liable to his estate, why should he not have made it a charge upon the share of his wife, in the same manner that he had charged the shares of his other children ? Was it not equality among the children that he should do so ? How can the plain meaning of these words be cut down so as to exclude it ? Can it be held, under such circumstances that they affect only a particular kind of indebtedness, and do not include "all sums" due ? Can we so hold without evidence of the most convincing nature that the testator did not intend to be understood as meaning that which he had so clearly expressed ? Is it· sufficient, to enable us to restrict the natural import of the words, that we may build a theory of equality as to distribution of benefits, without coupling with it the testator's idea as to the distribution of burdens. The duty of Courts in construing the last wills of deceased persons is to give effect to the intention of the testator as expressed in the instrument. When ascertained that is to govern, and in ar-

riving at it, when the words employed are plain and un-ambiguous and not doubtful when applied to the subject-matter, there is no room for construction.  *Hawman* v. *Thomas*, 44 Md. 43.   I am therefore of the opinion that the decree should be affirmed.

(Filed January 29th, 1900).